**County of Mercer v. United Steel Workers of America AFL-CIO**

*Donald Hittle,* for plaintiff.

*Francis Fornelli,* for defendants.

ACKER, J., January 5, 1973.—This matter arises from a motion to continue a preliminary injunction entered by this court without hearing on January 1, 1973. Four days later, this hearing was held at which testimony was taken on behalf of all parties. The following findings of fact are made:

## FINDINGS OF FACT

1. On January 5, 1971, the United Steel Workers of America, AFL-CIO, was certified as the duly authorized collective bargaining representative for certain employes of the Mercer County Home and Hospital who formed into Local 7800 of the United Steel Workers of America.

2. The following defendants are presently officers of that local: Harry Beckman, President; Alfred Heasley, Treasurer; Joan Goss, Recording Secretary; and Edith Cameron, Grievance Chairman.

3. The contract between the parties expired December 31, 1972.

4. On July 13, 1972, the parties for the time commenced negotiations toward arriving at a new agreement.

5. The parties subsequently met for negotiation purposes on September 14, October 11, 17, 18, 23, December 11 and 13.

6. The negotiating team for the County of Mercer consisted of Edward R. DeSaultes, the administrator of the Mercer County Home and Hospital, William Coleman, the then chairman of the board of commissioners of the county and Thomas Finucane, assistant administrator of the Mercer County Home and Hospital.

7. The negotiating team for defendants consisted of Donald Beckman, Alfred Heasley, Joan Goss, Edith Cameron and Donald C. Atwell, the latter being staff representative of District 20.

8. At the conclusion of the negotiating session of December 13, 1972, all differences between the parties had been resolved with the exception of wages and payment for unused sick leave.

9. On December 13, 1972, both parties filed a "Mediator Notice" using Act 195 addressed to the Department of Labor and Industry, Bureau of Mediation, Harrisburg, Pa. By this notice it is provided, "In accordance with the provisions of Section 801 of the Public Employee Law, Act 195, of 1970, you are hereby notified that a dispute exists between the following parties . . ." The parties listed are the County of Mercer and the United Steel Workers of Mercer District 20, Local 7800. The budget submission date is stated as December 31, 1972, on the mediation notice. The notice is filed by Edward R. DeSaultes as employer representative and Donald C. Atwell as employe representative.

10. The above mediation notice was sent by an accompanying letter to the mediation service in Harrisburg.

11. Despite the application for mediation services on December 23rd, Local 7800 caused to be published in a story in the Sharon Herald, a newspaper of general circulation in the County of Mercer, notice that the union planned to strike as of January 1, 1973, if a contract was not arrived upon.

12. That the following day the Mercer County Home and Hospital, through its administrator, commenced limiting admissions to the hospital and preparing emergency alternate plans in the event a strike would, in fact, occur.

13. On December 23, 1972, in the evening, a Gerald Goff called Edward DeSaultes stating that he had been assigned by the Bureau of Mediation and was available for negotiations at any time.

14. Immediately upon Edward DeSaultes reading in the Sharon Herald of a potential strike, he called the employe representative, Donald C. Atwell, asking why such action was taken to which the representative responded that this was the feeling and desire of the union members.

15. Immediately following the call from Gerald Goff, Edward DeSaultes contacted Donald C. Atwell and set December 27, 1972, as the first meeting date under the auspices of the Bureau of Mediation. The parties subsequently met on December 28th and 29th, but were unable to resolve the two remaining issues confronting the parties at the conclusion of their negotiations on December 13th.

16. On Friday, December 29, 1972, Donald E. Beckman informed the three present Mercer County Commissioners that a strike would occur at midnight on January 1, 1973.

17. As of the date and time of the strike there were 230 patients at the Mercer County Home and Hospital; down five through deaths from the usual 235, in that there was no intake after the publication of the Sharon Herald notice of the strike.

18. The Mercer County Home and Hospital has a total of 198 employes, of which 165 are members of the union. Department heads, office workers, registered nurses and watchmen do not belong to the union and are not eligible under law to do so. Practical registered nurses, housekeepers, dietary employes, laundry employes, farm hands and various technicians do belong to the union.

19. The strike occurred on January 1, 1973, at

12:07 a.m. When the employes walked out, the administrator, his assistant administrator, director of maintenance, dietary director, head of housekeeping and six nurses worked throughout the night to maintain the patients; at 6 a.m. additional personnel entered the hospital to assist, all being registered nurses or employes of a supervisory nature.

20. The union, in the interim at about 12 midnight on December 31st, established a picket line at the entrance to the Mercer County Home and Hospital on Route #58 by blocking the entrance and exit with motor vehicles in such a manner that it was necessary for a vehicle to stop and be checked before it would be admitted into the hospital grounds.

21. Members of the Union under the direction of its president, Donald Beckman, prevented the entry of those desiring to enter, other than supervisory employes and nurses, by stating that he "did not want them (others) involved in our problems."

22. One of the alternate plans of the administrator was to request the some 130 auxiliary members, who normally man the lobby shop, move patients, and take care of fund raising, to come in and supplement the managerial staff which was attempting to care for the needs of the patients. These persons had been contacted through a phone canvas but none of them appeared in the facility to work after the strike had commenced.

23. Between 12 midnight and 6 a.m. of January 1st, there were 13 persons available to take care of the basic needs of the patients. At 6 a.m. of January 1, 1973, nine more registered nurses and four office personnel joined to take care of the day shift.

24. At daylight, the administrator, Edward De-Saultes, noted that cars blocked both driveways and vehicles were stopped; and he received a report that

persons, not supervisory employes or nurses, were turned away.

25. The personnel present in the hospital were able to maintain minimum care needs during the period from midnight until the end of the strike at approximately 10:30 a.m. on January 1st.

26. The biggest immediate problem was preparation of breakfast which had to be commenced at 2 a.m. At this time, 107 patients were able to be brought to or walk to the dining room, while 123 were served by trays at or near their bedside. Many of the patients had special dietary needs, 34 were required to be fed by others at bedside while 89 could feed themselves. Five were absolutely bedridden and 132 were chair ridden patients; 44 were diabetic patients, and 97 were incontinent, meaning that they could not control their bladder or bowel or both. There were 44 blind patients but all patients needed some form of medication and had some form of illness as a prerequisite to being admitted to the hospital.

27. The hospital is supplied by one doctor from 9:30 to 2:30 during the five working days of Monday through Friday and a second doctor Monday, Wednesday and Friday, for three hours but neither doctor was called or present during the strike period.

28. In addition to the serving of breakfast, the immediate and critical needs were the cleaning and dressing of the patients to prepare them to be fed or gotten to the dining room for feeding.

29. In the opinion of the administrator, which this court accepts, there would have been great problems in attempting the continuance of minimum care of the patients with the personnel who were permitted entrance into the facility by the union.

30. The order of court terminating the strike was served upon the striking members at 10:45 a.m. on

January 1st and the employes returned to work at 10:50 a.m.

31. Since the strike there have been additional meetings with the mediator, the last of which was immediately prior to the court session, but they have brought no solution.

32. The mediator is recommending to the Bureau of Mediation that fact-finding facilities be instituted in an effort to settle the strike but there is no assurance that the mediation service will, in fact, determine that fact finding is a proper remedy.

33. That if the strike had continued through the day of January 1st the supervisory employes would have been fortunate to have been able to have handled the necessary duties concerning the patients and that by the continued denial of access of volunteers minimal services could have been continued only so long as the supervisory personnel and nurses were able to physically remain active.

It is the position of the county that the employes by their strike have violated section 1002 [1] for doing so during the pendency of collective bargaining. The employes respond that the county did not comply with the requirements of section 801 [2] in that the

---

[1] Act of July 23, 1970, P. L. 563 (No. 195), Art. X, sec. 1002, 43 PS § 1101.1102. This section reads: "Strikes" by public employes during the pendency of collective bargaining procedures set forth in sections 801 and 802 of Art. VIII are prohibited. In the event of a strike during this period the public employer shall forthwith initiate an action for the same relief and utilizing the same procedures required for prohibited strikes, under section 1001."

[2] Act of July 23, 1970, P. L. 563 (No. 195), Art. VIII, sec. 801, 43 PS§1101.801, which reads: "If after a reasonable period of negotiation, a dispute or impasse exists between the representatives of the public employer and the public employes, the parties may voluntarily submit to mediation, but if no agreement is reached between the parties within twenty-one days after negotiations have commenced, but in no event later than one hundred fifty days prior

matter was not submitted to mediation in such time as to have a determination after a maximum of 21 days of negotiations prior to 150 days before the budget submission date. That budget submission date was December 31, 1972. One hundred and fifty days previous thereto was August 3, 1972. The employes contend that although all strikes by public employes were previously denied in our Commonwealth,[3] the Public Employe Relations Act of 1970 completely changed the law to permit the denial of strike in four specific instances. The four instances are (1) strikes by guards at prisons; (2) strikes by guards at mental hospitals; (3) strikes by employes directly involved with and necessary to the functioning of the courts of this Commonwealth. It is agreed that strikes by the above three categories of persons are specifically prohibited at anytime.[4] The fourth instance where strikes are prohibited under the Act of 1970 is if there is a strike during the pendency of collective bargaining procedures. To this should be added that if a strike by public employes occurs after the collective bargaining procedures have been pursued and completely utilized and exhausted, it shall not be prohibited ". . . unless or until such a strike creates a clear and present danger or threat to the health, safety or welfare of the public."[5]

to the 'budget submission date,' and mediation has not been utilized by the parties, both parties shall immediately, in writing, call in the service of the Pennsylvania Bureau of Mediation."

[3] Act of June 30, 1947, P. L. 1183, sec. 2, 43 PS §215.2.

[4] In this court's opinion the legislature should have included employes of county homes and hospitals for the need of such employe is in some instances as great as that in the three categories listed above.

[5] Act of July 23, 1970, P. L. 563 (No. 195), Art. X, sec. 1003, 43 PS §1101.1003.

The parties entered into an agreement between themselves for the period of January 1, 1971, to and including December 31, 1972. The last paragraph of section 2 provides that "in case there is any conflict between the provisions of this agreement and the provisions of public law 195 (Public Employe Relations Act), the provisions of Public Law 195 shall be controlling." But further, by section XVII B.:

"Either party *may*, on or before May 1, 1972, give notice to the other party of the desirè of the party giving such notice to negotiate with respect to the terms and conditions of a new agreement and the provisions of any new agreement shall not be effective prior to January 1, 1973, if such notice is given, the parties shall meet within thirty (30) days after May 1st, 1972, to negotiate with respect to such matters and the provisions of any new agreement shall not be effective prior to January 1, 1973. Either party *may* thereafter resort to Public Law 195 (Public Employee Relations Act) as the case may be, in support of its position in respect to such matters, as well as any other matter in dispute." (Italics supplied.)

Wherefore, it appears that, because the first meeting of the parties toward negotiations was not held until July 13, 1972, they did not proceed as they were entitled to in the first 30 days of May to attempt to negotiate a new agreement. It is to be noted that this was a voluntary matter with the option by either or both sides to give such notice. By waiting until July 13th they left but 21 days in which to voluntarily negotiate and submit the matter to mediation. However, it is questionable whether they could have submitted the matter to mediation, for by section 1101.801 of the act it is required that there be ". . . a reasonable period of negotiation" during which a dispute or impasse must exist before either party may re-

quest mediation. The next meeting was not until September 14th, after the last day, according to the employes, when they could mediate under the above provisions of the act. If the employes are correct by the parties waiting so long to negotiate, the county cannot secure an injunction to require them to return to work under any circumstances and is relegated to the same rights which a nonpublic employer would have to enjoin unreasonable picketing denying free access to a plant by those desiring to enter. However, the agreement does provide that either party may thereafter resort to Public Law 195 in support of its position. It is the contention of the county that not only did it resort to the Public Employe Relations Act but the union did as well through a mediation notice on a form of the Bureau of Mediation signed by Donald C. Atwell, employe representative, and Edward R. DeSaultes, employer representative. Therefore, it is the contention of the county that even though both parties failed to request mediation until December 13th, some 122 days, or four months and two days, over the last permitted date, the union cannot now contend that they are subject to the provisions of the act which they have jointly requested to be used to their benefit. The union responds that although we requested the assistance of the mediation service, we did not thereby accept all of the provisions that the parties are normally bound by in doing so, especially the possibility of an injunction for a strike during the period of mediation. This, however, sounds strangely like hearing the piper without paying for the tune. We conclude that the union, as well as the employer, voluntarily by their joint written application for mediation, disregarded the provisions of section XVII (B) of their contract and the 150-day rule of section 801. Further, this court concludes that

the words "collective bargaining procedures," as set forth in sections 801 and 802 of article VIII taken from section 1002 as to when strikes are prohibited, deal with the procedures of voluntarily submitting to mediation and subsequent fact-finding panels as provided by section 802. In that both parties requested collective bargaining procedures to come into play, the union cannot now contend that they will take its benefits without living within the provisions which deny strikes during the negotiation stage.

By the testimony of Edward DeSaultes, Administrator of the Mercer County Home and Hospital, the mediator is recommending a fact-finding panel pursuant to section 802.[6]

Although it was not raised by the county in its application for injunction, testimony was received and it was contended in argument that the strike at the county home and hospital "creates a clear and present danger or threat to the health, safety or welfare of the public." The manner in which the employes conducted the strike, by denying volunteers and others, who wished to assist, from caring for the invalid patients at the county home and hospital, in this court's opinion, a clear . . . present danger to the health, safety and welfare of the public was rapidly emerging. With 97 of 230 patients unable to control either their bladder or bowel or both functions, 34

---

[6] By the Act of July 23, 1970, Art. VIII, sec. 802, P. L. 563, 43 PS § 1101.802, once the board of mediation receives notice that an agreement has not been reached after mediation has commenced, it ". . . *may in its discretion* appoint a fact-finding panel which panel *may* consist of either one or three members. If a panel is so designated or selected it shall hold hearings and take oral or written testimony and shall have subpoena power. If during this time the parties have not reached an agreement, the panel shall make findings of fact and recommendations." (Italics supplied.)

who had to be fed by others, 44 who were diabetic and require medication regularly, 123 who must be served by trays at or near their bed side, 44 of whom are blind, it would not be long until there would be a substantial health hazard. However, this section of the statute cannot be utilized until sections 801 and 802 of article VIII have been "completely utilized and exhausted." What conditions will be present at the Mercer county home and hospital at that time cannot be determined at this date, although it would not require much imagination to visualize the conditions in the future.

Wherefore, this court declines at this time to declare a clear and present danger of a threat to the health, safety and welfare of the public; it does, however, continue the injunction due to the violation by the union of section 1002 in performing a strike during negotiations and mediation. The question remains as to how long the injunction should continue. By section 1101.802 there is no time limit upon the Bureau of Mediation for acting upon the application for fact-finders. Because section 1003 cannot be effective until sections 801 and 802 have been exhausted, it appears that the injunction must remain until word is received from the Board of Mediation as to whether it will appoint a fact-finding panel. If it does not elect to do so, the injunction shall cease. If it does, the parties are obligated to wait until the fact-finding panel holds its hearings and makes its recommendations, and, pursuant to the statute, sends the recommendations by registered mail to the board and to both parties not more than 40 days after the Bureau of Mediation has notified the board of its desire to have it hold hearings. Within 10 days after the findings and recommendations have been sent, the par-

ties are then obligated to notify the board and each other whether or not they will accept the recommendations of the fact-finding panel. If they do not, the panel is obligated to publicize its findings of facts and recommendations. Not less than five days nor more than 10 days, after the publication of the findings of fact and recommendations, the parties shall again inform the board and each other whether or not they accept the recommendations of the fact-finding panel. If the Board of Mediation has elected to have a fact-finding board at the conclusion of all of that, the injunction shall cease. When this injunction ceases, the union shall be at liberty to follow whatever course it may desire, and if it does elect to again strike, the county is at liberty to make application pursuant to section 1003 and attempt to establish that the strike has created a clear and present danger or threat to the health, safety or welfare of the public. In accordance with the above views, the following order is entered.

## ORDER

And now, January 15, 1973, after full hearing in the above-entitled matter the previous order of court of January 1, 1973, being an injunction, is continued in full force and effect until the Bureau of Mediation notifies the parties that it will not appoint a fact-finding panel; or in the event that the Bureau of Mediation does elect to appoint a fact-finding panel, all of the periods and procedures as set forth in article VIII, sec. 802 of the Act of June 23, 1970, P. L. 563 (No. 195), 43 PS §1101.802, are expired. Upon the occurrence of either of the conditions as set forth above in this order, the injunction issued herein shall be dissolved.